T.C. Memo. 2004-116


UNITED STATES TAX COURT


ESTATE OF GEORGE C. BLOUNT, DECEASED, FRED B. AFTERGUT, EXECUTOR,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 540-02.                    Filed May 12, 2004.


        D and J each owned 50 percent of the outstanding
shares of B corporation.  In 1981, D, J, and B entered
into a buy-sell agreement restricting transfers of B's
stock both during the shareholders' lifetimes and at
death.  Lifetime transfers required the consent of the
other shareholders.  At death, a shareholder's estate
was required to sell, and B was required to buy, the
shareholder's shares at a price set in the agreement.
The agreement further provided that it could be
modified only by the written consent of the parties to
the agreement, which consisted of D, J, and B.  D and J
subsequently transferred shares to an employee stock
ownership plan (ESOP) that B established.  J died, and
B redeemed his shares pursuant to the agreement,
leaving D and the ESOP as the only remaining
shareholders, with D owning a controlling interest in
B.  D and B were the only remaining parties to the
agreement.

        In 1996, without obtaining the ESOP's consent, D
and B modified the agreement, changing the price and

terms under which B would redeem D's shares on D's death, but leaving unchanged the provision requiring the consent of other shareholders for lifetime transfers. The modified price was substantially below the price that would have been payable pursuant to the unmodified agreement. D died, and B redeemed his shares as set forth in the modified agreement. D's estate reported the value of the shares D held at death as equal to the price set forth in the modified agreement.

Held: The modified agreement is disregarded for purposes of determining the value of D's shares for Federal estate tax purposes because D had the unilateral ability to modify the agreement, rendering the agreement not binding during D's lifetime, as required by sec. 20.2031-2(h), Estate Tax Regs.

Held, further: Sec. 2703, I.R.C., applies to the modified agreement because the 1996 modification, which occurred after the effective date of sec. 2703, I.R.C., was a substantial modification.

Held, further: The modified agreement is also disregarded under sec. 2703(a), I.R.C., because it fails to satisfy sec. 2703(b)(3), I.R.C., which requires that the terms of the agreement be comparable to similar arrangements entered into by persons in an arm's-length transaction.

Held, further: Fair market value of D's shares determined.

R. Douglas Wright, Larry S. Pike, Alfred B. Adams, III, and Sara L. Doyle, for petitioner.

Travis Vance, III, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION . . . . . . . . . . . . . 4

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    Decedent and BCC . . . . . . . . . . . . . . . . . . . . . 5

II.   1981 Agreement . . . . . . . . . . . . . . . . . . . . . . 6

III.  ESOP . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.   Life Insurance and the Death of Mr. Jennings . . . . . . 10

V.    1996 Agreement and Redemption of Decedent's BCC Shares . 11

VI.   Estate's Return . . . . . . . . . . . . . . . . . . . . . 15

VII.  Expert Testimony . . . . . . . . . . . . . . . . . . . . 16
      A.   Estate's Expert Mr. Grizzle . . . . . . . . . . . . 17
      B.   Estate's Expert Mr. Fodor . . . . . . . . . . . . . 19
      C.   Respondent's Expert, Mr. Hitchner . . . . . . . . . 21

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.    Effectiveness of the Buy-Sell Agreement . . . . . . . . 25
      A.   Terms of the Buy-Sell Agreement . . . . . . . . . . 28
      B.   Binding-During-Life Requirement . . . . . . . . . . 33
      C.   Section 2703 . . . . . . . . . . . . . . . . . . . 39
           1.   Applicability of Section 2703 . . . . . . . . 40
           2.   Section 2703(b)(3) . . . . . . . . . . . . . 46

II.   Valuation of Decedent's BCC Shares . . . . . . . . . . . 55
      A.   Fair Market Value . . . . . . . . . . . . . . . . . 55
      B.   Expert Testimony . . . . . . . . . . . . . . . . . 56
      C.   BCC's Value Exclusive of Insurance Proceeds . . . . 58
           1.   Experts' Concluded Value Exclusive of Insurance
                Proceeds . . . . . . . . . . . . . . . . . . 58
           2.   Mr. Fodor's Adjustment for ESOP Repurchase
                Obligation . . . . . . . . . . . . . . . . . 60
           3.   Mr. Hitchner's Estimate of Excess Cash . . . 64
           4.   Conclusion . . . . . . . . . . . . . . . . . 65
      D.   Effect of Redemption Obligation on Insurance
                Proceeds . . . . . . . . . . . . . . . . . . 66
      E.   Accounting for Insurance Proceeds . . . . . . . . . 75

III.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . 81

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge: Respondent determined a Federal estate tax deficiency of $2,354,521 with respect to the Estate of George C. Blount (the estate). After concessions, the issue remaining for decision is the value for Federal estate tax purposes of 43,079.9657 shares of Blount Construction Co. (BCC) owned by George C. Blount (decedent) on September 21, 1997, his date of death and the valuation date. Subsumed within that issue is the question of whether a buy-sell agreement covering the BCC shares fixes their value, or whether the agreement should be disregarded in determining that value.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and the accompanying exhibits.

I.    <u>Decedent and BCC</u>

Decedent was a U.S. citizen domiciled in Georgia when he died testate on September 21, 1997. Decedent's will was probated in Fulton County, Georgia, with Fred B. Aftergut appointed as executor.

At his death, decedent owned 43,079.9657 (hereinafter rounded to 43,080) shares of BCC, constituting 83.2 percent of its outstanding stock. BCC was located in Atlanta, Georgia, and had been in existence in one form or another since 1946, when decedent's father founded Blount Asphalt Co. Decedent became involved in the business shortly thereafter, and when his father died, decedent and his brother-in-law, James M. Jennings, became equal owners.

BCC was in the general business of the construction and repair of roads, streets, driveways, parking lots, and similar projects. At decedent's death, BCC also operated an asphalt plant. In addition, BCC had certain nonoperating assets, including an idle asphalt plant and notes receivable. BCC required approximately $1.5 million in cash and cash equivalents to operate. Among other things, this allowed it to meet bonding requirements without the need for personal guaranties. When decedent died, BCC had at least $2.5 million in cash and cash equivalents.

BCC performed work for private entities, commercial enterprises, municipalities, and the State of Georgia. It obtained work through a competitive bid and negotiation process and did not rely on any one client or customer for a large percentage of its revenues. BCC operated on a fiscal year ending January 31. Each year, it prepared "value in use" analyses in which it estimated the value of its assets, relying on published information regarding used equipment values, including auction prices and information published by the equipment manufacturers.

Other than his brother-in-law, Mr. Jennings, decedent had no family member who owned stock in or worked at BCC. BCC had a core group of long-term employees, some employed at BCC for more than 30 years when decedent died. Decedent did not have a personal relationship with these or any other BCC employees outside of work. Decedent served as BCC's president and was actively involved in its management, making most major decisions, including the selection of projects on which to bid and the bid amounts, until the months preceding his death.

II. 1981 Agreement

In 1981, decedent, Mr. Jennings, and BCC entered into an agreement restricting the transfer of BCC's stock entitled

"Shareholders Agreement" (the 1981 Agreement).[1]  At the time,
decedent and Mr. Jennings each owned one-half of BCC's
outstanding stock.  The 1981 Agreement contained restrictions on
transfers of BCC stock both during the shareholders' lifetimes
and at death.  The preamble provided that subsequent shareholders
would "benefit from and be bound by" the agreement.  With respect
to lifetime transfers, a section entitled "Restrictions on
Transfer of Capital Stock During Life" provided:  "No Shareholder
shall transfer or encumber any of his Capital Stock in the
Company to any person, firm, or corporation without the written
consent of the other Shareholders."  "Shareholders" were defined
in the 1981 Agreement's first paragraph as decedent and Mr.
Jennings, a definition that excluded subsequent shareholders.
However, section 3(a) of the 1981 Agreement, entitled "Other
Shareholders to be Bound", also denoted as "shareholders" persons
other than Mr. Jennings or decedent who received shares directly
from BCC or as transferees from other shareholders.  The section
further provided that the shares of such other shareholders would

---

[1] Decedent, Mr. Jennings, and BCC had previously entered
into a restrictive agreement in 1958 covering their BCC stock.
The 1981 Agreement expressly provided that it superseded any
earlier agreements.

be subject to the same terms and conditions as the shares owned by decedent and Mr. Jennings.[2]

With respect to transfers at death, the 1981 Agreement in a section entitled "Purchase Upon Death" required that a shareholder's estate sell and BCC buy the shareholder's stock at an established price. The purchase price initially set in the 1981 Agreement was $3,300 per share, described as book value. The 1981 Agreement provided that BCC and the shareholders were to redetermine the per-share purchase price annually on August 1, but no such redetermination was ever done. In the absence of any redetermination, the 1981 Agreement provided that the per-share purchase price would be equal to BCC's book value at the fiscal yearend immediately preceding the deceased shareholder's death.

The 1981 Agreement provided that it would be governed by Georgia law, and it expressly set forth the manner in which it could be modified: "Modification--No change or modification of

---

[2] Elsewhere, the 1981 Agreement set forth an endorsement, required to be placed on BCC's stock certificates, that cross-referenced the 1981 Agreement and its restrictions on transferability. The endorsement further stated that the restrictions "provide, among other things, that such shares must first be offered for sale to the Company and the other Shareholders before they may be offered or sold to any other person." The only two stock certificates in the record, issued in 1996, do not contain the foregoing endorsement, however.
There were apparently other restrictions on the transfer of the BCC stock that are not in the record. The aforementioned stock certificates issued in 1996 refer to a letter agreement dated Jan. 16, 1996, that is not in the record.

this Agreement shall be valid unless it is in writing and signed by all of the parties hereto." The 1981 Agreement did not define "parties" or contain any mechanism for adding parties.

III. ESOP

In 1992, BCC adopted the Blount Construction Co. Employee Stock Ownership Plan (ESOP).[3] BCC made annual cash contributions to the ESOP, and the ESOP obtained shares of BCC stock either from decedent and Mr. Jennings or from the company, making it a third, minority shareholder. According to the ESOP's Summary Plan Description, when plan participants retired or were otherwise entitled to obtain distributions, the ESOP was to distribute shares of BCC stock to them, and they had the right to require BCC to purchase their shares at designated times.

The ESOP participants were BCC employees, excluding decedent and Mr. Jennings. Decedent, Mr. Jennings, and Richard E. Lord (a longtime employee) were the original trustees of the ESOP. John Truono, who served as BCC's controller and corporate secretary, replaced Mr. Jennings as a trustee as of February 1, 1996.

Business Valuation Services, Inc. (BVS), performed an independent appraisal of BCC each year to establish the per-share value of BCC stock to be used for ESOP transactions. These per-

---

[3] In 1995, BCC established the Blount Construction Co., Inc. Employee Stock Ownership Plan/MMP. In 1996, this plan was merged into the ESOP.

share values were used when the ESOP purchased BCC shares and when the BCC stock of ESOP participants was redeemed. BVS concluded that the value of 100 percent of BCC stock was $8,041,126 ($86.73/share) as of January 31, 1996, and $8,491,321 ($164.01/share) as of January 31, 1997.[4]

IV. Life Insurance and the Death of Mr. Jennings

As part of succession planning, BCC obtained life insurance of approximately $3 million each on the lives of decedent and Mr. Jennings. Decedent also had BCC's controller, Mr. Truono, prepare "pro forma" financial analyses showing the impact on BCC of the redemption of his and Mr. Jennings's shares at different prices and under various assumptions. Mr. Jennings died on January 13, 1996, and BCC received $3,046,823 in life insurance proceeds. BCC redeemed Mr. Jennings's shares in September 1996 for $2,990,791, the price being based on BCC's book value of approximately $6.4 million at the preceding fiscal yearend, as required in the 1981 Agreement.[5] BCC used $1,990,791 in cash and

---

[4] Mr. Jennings died on Jan. 13, 1996, and his 43,080 shares were redeemed pursuant to the 1981 Agreement, see infra Pt. IV, on Sept. 4, 1996. The substantial difference in per-share value between the 1996 and 1997 BVS valuations reflects the redemption of Mr. Jennings's shares that occurred between the two valuations.

[5] Mr. Truono calculated BCC's book value as of the preceding fiscal yearend (Jan. 31, 1995) and the resulting price for Mr. Jennings's shares.

issued a note to Mr. Jennings's estate for $1 million to fund the redemption.

V.    1996 Agreement and Redemption of Decedent's BCC Shares

As a result of Mr. Jennings's death and the subsequent redemption of his shares in September 1996, decedent's 43,080 BCC shares became a controlling interest in the company, constituting 83.2 percent of the outstanding shares. The ESOP held the remaining 8,692 outstanding shares. After Mr. Jennings's death, decedent was the sole member of BCC's board of directors, and decedent and BCC were the only remaining signatories to the 1981 Agreement.

In October 1996, decedent discovered he had cancer. After consulting several doctors, decedent came to understand he was gravely ill, and the available treatment options would only extend his life a short time, if at all. One treatment option involved a life-threatening surgical procedure. Decedent began to put his affairs in order. Decedent had Mr. Truono prepare additional "pro forma" analyses showing the impact on BCC of the redemption of his shares at different prices.

One such analysis, pro forma 15, prepared in early November 1996 (Pro Forma 15), analyzed the impact on BCC of a purchase of decedent's shares for $4 million. Pro Forma 15 indicated that, taking into account BCC's receipt of approximately $3 million in

life insurance proceeds on decedent's death, the redemption of decedent's shares for $4 million would leave BCC with approximately $1.5 million in cash and cash equivalents. In Mr. Truono's judgment, this was the minimum amount that BCC required to operate without the need for personal guaranties for BCC's performance bonds and to ensure that BCC would be able to meet any obligations to its ESOP participants.[6]

Pro Forma 15, reviewed by decedent in early November 1996, assumed BCC had a fair market value of $155.32 per share, which Mr. Truono determined by dividing the $8,041,126 fair market value for BCC estimated in the then most recent BVS appraisal (for the fiscal year ended January 31, 1996) by BCC's 51,772 shares outstanding after the redemption of Mr. Jennings's shares.[7] Pro Forma 15 also showed a per-share book value of $173.77, which, assuming 51,772 outstanding shares, results in a total book value for BCC of $8,996,420.[8]

---

[6] Mr. Truono testified that, as of 1996, BCC had never spent more than $100,000 in a given year to redeem BCC shares.

[7] The 1996 BVS appraisal itself estimated a per-share fair market value of $86.73, which is the per-share value derived when the $8,041,126 fair market value it estimated for BCC is divided by the number of BCC shares outstanding before the redemption of Mr. Jennings's shares; i.e., 92,718.

[8] The per-share book value for BCC reflected in Pro Forma 15 does not appear to be derived from the book value as of the fiscal year ended Jan. 31, 1996 ($9,135,506, as reflected in the
(continued...)

On November 11, 1996, decedent and BCC executed an agreement entitled "Shareholders Agreement" (the 1996 Agreement), with decedent signing in his individual capacity and on behalf of BCC as its president. Mr. Truono attested decedent's signature. The 1996 Agreement required BCC to buy, and decedent's estate to sell, decedent's BCC shares for $4 million; i.e., the maximum price Mr. Truono believed BCC could pay in cash, taking into account BCC's receipt of approximately $3 million in life insurance proceeds from the policy on decedent's life. The next day decedent executed a codicil to his will. Decedent did not consult an attorney regarding the 1996 Agreement.

Given his review of Mr. Truono's Pro Forma 15, decedent was aware when he signed the 1996 Agreement setting the price for his shares as $4 million ($92.85/share) that the most recent BVS appraisal had valued BCC at approximately $8 million ($155.32/share), suggesting that decedent's shares had a fair market value of approximately $6.7 million. Decedent was further aware that Mr. Truono had computed BCC's book value to be approximately $9 million, suggesting that decedent's BCC shares had a book value of approximately $7.5 million. The unmodified

---

8(...continued)
1996 BVS appraisal), since 51,772 outstanding shares at a total book value of $9,135,506 would yield a per-share value of $176.46. Instead, the figure used in Pro Forma 15 appears to be a mid-year estimate of BCC's per-share book value.

1981 Agreement provided that the purchase price of decedent's shares would have been equal to their book value as of January 31, 1996 (as opposed to the figure contained in Pro Forma 15), or approximately $7.6 million, were he to die before February 1, 1997.[9]

In contrast to the 1981 Agreement, the 1996 Agreement was one page in length and addressed only the purchase and sale of decedent's BCC shares at his death. The operative section was entitled "Purchase Upon Death", similar to the section covering redemptions in the 1981 Agreement, and the language and organization of that section tracked the corresponding section found in the 1981 Agreement. The section covered the obligation to buy and sell, the purchase price, and the payment terms.

Unlike the 1981 Agreement, which contained a formula for adjusting the purchase price over time and allowed for payment of the purchase price in installments, the 1996 Agreement set a fixed purchase price of $4 million, without any provision for future adjustment, to be paid in one lump sum.

---

[9] This figure is calculated by dividing BCC's book value of $9,135,506, as of Jan. 31, 1996, by the 51,772 shares outstanding as of November 1996 to derive a per-share value of $176.46, and then multiplying that figure by decedent's 43,080 shares. Had the 1981 Agreement not been modified when decedent died in September 1997 (i.e., after Jan. 31, 1997, but before Feb. 1, 1998), BCC's book value as of Jan. 31, 1997, would have been used to determine the purchase price of his shares.

Despite the similarities in structure and language, the 1996 Agreement made no reference to the 1981 Agreement. The 1996 Agreement did not contain a provision restricting lifetime transfers or contain any other provision similar to those in the 1981 Agreement, such as required endorsements on stock certificates, the choice of law, or a provision indicating that the current agreement superseded all earlier agreements. It contained no requirement regarding the source of funds BCC was to use to purchase decedent's shares. The only signatories to the 1996 Agreement were decedent and BCC. The ESOP did not sign or otherwise consent to the 1996 Agreement.

Decedent died on September 21, 1997. Shortly after decedent's death, BCC redeemed his shares for $4 million as required in the 1996 Agreement, using the entire proceeds of $3,146,134 from his life insurance policy along with additional cash on hand. After the redemption of decedent's shares, the ESOP owned 100 percent of the stock of BCC.

## VI. Estate's Return

The estate timely filed its Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, reporting the value of decedent's 43,080 shares of BCC stock as of the valuation date at $4 million, the purchase price set forth in the 1996 Agreement. In a notice of deficiency, respondent determined

that decedent's BCC stock had a fair market value of $7,921,975. The estate timely petitioned this Court for redetermination.

## VII. Expert Testimony

The estate submitted the expert report and testimony of John T. Grizzle in support of its contention that the terms of the buy-sell agreement at issue were comparable to similar agreements entered into by persons in arm's-length transactions within the meaning of section 2703(b)(3).

In light of the possibility that the value stipulated in the buy-sell agreement at issue would be disregarded in this proceeding, both the estate and respondent submitted expert reports and testimony regarding the fair market value of decedent's BCC stock as of the valuation date.  The estate offered Mr. Grizzle and Gerald M. Fodor as experts in valuation of closely held companies.  Respondent offered James R. Hitchner.[10]

---

[10] Before trial, respondent also indicated that he would seek to have the appraisals of BCC performed by BVS for purposes of the ESOP received into evidence as party admissions. Respondent has not maintained this contention on brief, and we deem it abandoned.  See Bradley v. Commissioner, 100 T.C. 367, 370 (1993); Sundstrand Corp. v. Commissioner, 96 T.C. 226, 344 (1991); Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988). Moreover, neither party made any attempt to comply with the requirements of Rule 143(f) for submitting the BVS appraisals as expert testimony.

We accepted all three as experts and received their written reports into evidence as direct testimony.

A.   Estate's Expert Mr. Grizzle

Mr. Grizzle is a certified public accountant who has represented clients in mergers and acquisitions.

Mr. Grizzle concluded that the terms of the buy-sell agreement at issue were comparable to similar arrangements negotiated at arm's length.  In reaching this conclusion, Mr. Grizzle focused solely on the price term.  He asserted that "Professionals familiar with the industry most often value a construction company by applying a multiple of four (4) to the entities' [sic] cash-flow adjusted for non-operating and non-recurring items."  He then adjusted BCC's cashflow and compared the purchase price for decedent's BCC stock in the 1996 Agreement to the adjusted cashflow.  He concluded that the price for decedent's BCC shares represented a 4.25 multiple of its adjusted cashflow.  Because this multiple was consistent with the multiple he claimed professionals familiar with the construction industry most often use, he concluded that the price set forth in the 1996 Agreement was a fair market price and that the terms of the Modified 1981 Agreement were therefore comparable to similar arrangements entered into at arm's length.

Mr. Grizzle also looked at the sales to third parties of 100 percent of the stock of three companies allegedly comparable to BCC. One of the companies was sold twice, so Mr. Grizzle examined four transactions in all. The companies Mr. Grizzle considered included a company that constructed cellular telephone towers, a company that installed natural gas compressors and pipelines, and a management company that hired subcontractors to build chemical and natural gas liquefaction plants. In each case, he determined the company had sold for approximately four times adjusted cashflow.

Mr. Grizzle did not contend that the sale prices of the companies he examined were determined by using a multiple of adjusted cashflow. Rather, he backed into the multiples after the fact by comparing the sale prices to the adjusted cashflows. He compared those multiples to the multiple of cashflow implicit in the purchase price designated in the 1996 Agreement to conclude that the price term was comparable to what unrelated parties have negotiated at arm's length.

On the basis of this analysis, Mr. Grizzle calculated BCC's fair market value, and the value of decedent's shares, by multiplying the weighted average of BCC's adjusted cashflows over the 5 fiscal years ended January 31, 1997, by four, weighting the most recent year more heavily than the earliest one. Mr. Grizzle

concluded that the fair market value for BCC was $4,541,678, and decedent's 43,080 BCC shares had a fair market value of $3,778,676 as of the valuation date.

In valuing BCC, and comparing the multiple implicit in BCC's price to the multiples implicit in the sale prices of companies he reviewed, Mr. Grizzle did not consider the value of BCC's nonoperating assets. He testified that in actual sales such assets are not normally part of the transaction, as the seller usually retains those assets.

B. Estate's Expert Mr. Fodor

Mr. Fodor is a certified business appraiser. He is a member of the Institute of Business Appraisers and the Appraisal Foundation, organizations which he has served in a number of capacities. Mr. Fodor has published articles and given lectures regarding appraising. He has performed numerous appraisals for business and litigation support purposes.

Mr. Fodor relied on a blend of income- and asset-based valuation approaches to value BCC. For his income approach, Mr. Fodor used a capitalization of earnings model. He began by projecting BCC's "net free cash flow capacity" for the year immediately following the valuation date, relying on BCC's historical earnings data to do so. Mr. Fodor adjusted revenues and expenses as he deemed appropriate to reflect earning

capacity, including an allowance for taxes and a downward adjustment to earning capacity of $200,000 to account for annual contributions to the ESOP. He also adjusted for depreciation, capital investment, and retained working capital. He concluded that BCC would have $234,060 in net free cashflow capacity.

Mr. Fodor then determined a capitalization rate; i.e., the rate an investor would require to invest in BCC taking into account the riskiness of the investment, and an expected growth rate. Mr. Fodor calculated a capitalization rate of 32.94 percent. He chose 4 percent as his expected growth rate. Mr. Fodor subtracted the expected growth rate from the capitalization rate to yield a net capitalization rate, which he then divided into the net free cashflow capacity to calculate BCC's capitalized earnings. He determined capitalized earnings of $809,896.

Mr. Fodor added approximately $5.6 million to capitalized earnings, consisting of BCC's net working capital (current assets less current liabilities) as of the valuation date ($3,187,372) as well as an amount equal to the difference between BCC's assets' book value and fair market value (as reflected in BCC's internal "value in use" analyses) ($2,555,895). He then subtracted $750,000, which he claimed reflected the obligation to repurchase BCC shares held by ESOP participants upon retirement

or separation.  This yielded a total company income-based value of $5,803,163.

Mr. Fodor used the capitalized excess earnings method to determine that BCC's asset-based value equaled $8,678,805 as of the valuation date.  Mr. Fodor then subtracted from the net asset value the $750,000 estimate of the obligation to repurchase BCC shares from ESOP participants to reach a final asset-based value of $7,928,805.

Mr. Fodor weighted the income-based value of $5.8 million at 75 percent and the asset-based value of $7.9 million at 25 percent, to yield a final blended value of $6 million (rounded) for 100 percent of the shares of BCC.  Multiplying this value by decedent's 83.2-percent interest in BCC resulted in a corresponding $4,992,537 fair market value for decedent's 43,080 shares, as of the valuation date.  Mr. Fodor did not include the life insurance proceeds BCC received on decedent's life in either his income- or asset-based approach on the grounds that those proceeds were offset by BCC's obligation to redeem decedent's BCC stock.  Nor did he apply any discounts or premiums in valuing the block of shares at issue.

C.   Respondent's Expert, Mr. Hitchner

Mr. Hitchner is accredited in business valuation with the American Institute of Certified Public Accountants and is an

accredited senior appraiser with the American Society of Appraisers. He has 22 years of valuation experience and has taught courses and written several articles on business valuation.

Mr. Hitchner also relied on a blend of income- and asset-based approaches to value BCC. Like Mr. Fodor, Mr. Hitchner used a capitalization of earnings model to derive his income-based value. Mr. Hitchner projected BCC's net free cashflow capacity for the year immediately following the valuation date based on BCC's historical earnings over four different periods,[11] adjusted for taxes, depreciation, capital investment, and retained working capital. He increased the historical net after-tax earnings by an estimated 5-percent growth rate.[12]

Mr. Hitchner then calculated a capitalization rate of 20 percent, from which he subtracted his estimated 5-percent growth rate, to yield a net capitalization rate of 15 percent. By

---

[11] Mr. Hitchner removed from earnings certain interest income generated by the company's "excess cash"; i.e., cash that he considered in excess of operating, or working capital, needs. He considered this "excess cash" to be a nonoperating asset to be accounted for separately in his income-based approach. Insofar as nonoperating assets were to be taken into account separately under his approach, he removed the income from those assets, including the interest generated by "excess cash", from BCC's earnings.

[12] Mr. Fodor did not adjust for any projected earnings growth.

dividing the net capitalization rate into the net free cashflow capacity he derived for each of the four different periods, Mr. Hitchner determined capitalized earnings of $2.5 to $4.1 million.

Mr. Hitchner calculated that BCC had approximately $2.3 million of nonoperating assets by identifying actual nonoperating assets (valued at $433,572) and determining the "excess cash" on hand, which he estimated at $1,869,941. He derived this figure by comparing BCC's ratio of cash to assets as of the valuation date with industry standards for the Standard Industrial Code (SIC) category that he believed most closely matched BCC. He then added this $2.3 million of nonoperating assets to his range of capitalized earnings to yield an income-based value in a range from $4.8 to $6.4 million. Unlike Mr. Fodor, Mr. Hitchner did not decrease his income-based value by any amount associated with the obligation to repurchase shares held by the ESOP participants.

Mr. Hitchner used two different approaches to determine BCC's asset-based value: The adjusted book value approach, where he determined BCC's book value and then adjusted it to reflect the fair market value of BCC's machinery and equipment, as reported in BCC's internal "value in use" analyses, and the modified adjusted book value approach, where he made the adjustments described above and then decreased the value of BCC's

machinery and equipment by 40 percent to reflect the opinion of BCC management that BCC's machinery and equipment could be sold for only about 60 percent of the value reflected in the "value in use" analyses. Rather than attempting to compute asset values as of the valuation date, Mr. Hitchner provided value estimates as of the fiscal yearends immediately before and after the valuation date. The values estimated under the adjusted book value approach were $8,891,024 and $8,478,254 for the fiscal years ended January 31, 1997 and 1998, respectively. The values estimated under the modified adjusted book value approach were $7,596,838 and $7,052,766 for the fiscal years ended January 31, 1997 and 1998, respectively. As with the income approach, Mr. Hitchner did not reduce the asset-based value to reflect any ESOP repurchase obligation. He also did not indicate a final value under either approach.

To determine a final value for BCC, Mr. Hitchner indicated that he gave the greater weight to the modified adjusted book value approach and equal but lesser weight to the income approach and the adjusted book value approach. He did not disclose the precise weighting for each approach. Rather, he presented a "concluded" value of $7 million.

To this amount, Mr. Hitchner added $3,046,823 of insurance proceeds on decedent's life[13] to yield a value of approximately $10 million for 100 percent of BCC's shares.  Multiplying this amount by decedent's 83.2-percent interest in BCC resulted in a corresponding value of $8,360,000 (rounded) for decedent's 43,080 BCC shares, as of the valuation date.  Like Mr. Fodor, Mr. Hitchner did not apply any discounts or premiums in valuing decedent's block of shares.

## OPINION

## I.  Effectiveness of the Buy-Sell Agreement

Federal estate tax is imposed on the transfer of a U.S. citizen's taxable estate.  Sec. 2001(a); U.S. Trust Co. v. Helvering, 307 U.S. 57, 60 (1939).  The taxable estate is defined as the gross estate less prescribed deductions.  See sec. 2051. The gross estate includes all property interests owned by the decedent at death; the value of the gross estate is generally the fair market value of the included property as of the valuation date, which is generally the date of death.  See secs. 2031(a), 2033; sec. 20.2031-1(b), Estate Tax Regs.

---

[13] Although described as the life insurance proceeds on decedent's life, the figure Mr. Hitchner actually used was that for the proceeds from the policy on Mr. Jennings's life.  The insurance proceeds received on decedent's life were $3,146,134.

An exception to the general valuation rule exists where the property in question is subject to an enforceable buy-sell agreement.  See, e.g., <u>St. Louis County Bank v. United States</u>, 674 F.2d 1207, 1210 (8th Cir. 1982); <u>Bommer Revocable Trust v. Commissioner</u>, T.C. Memo. 1997-380.  However, for a buy-sell agreement to control value for Federal estate tax purposes, it must meet certain requirements set forth in section 20.2031-2(h), Estate Tax Regs., Rev. Rul. 59-60, 1959-1 C.B. 237, and the caselaw.  We summarized those requirements in <u>Estate of Lauder v. Commissioner</u>, T.C. Memo. 1992-736, as follows:

> It is axiomatic that the offering price must be fixed and determinable under the agreement.  In addition, the agreement must be binding on the parties both during life and after death.  Finally, the restrictive agreement must have been entered into for a bona fide business reason and must not be a substitute for a testamentary disposition.  [Citations omitted.]

Buy-sell agreements that fail to meet these requirements are disregarded in determining value.  <u>Estate of Weil v. Commissioner</u>, 22 T.C. 1267, 1274 (1954); <u>Estate of Lauder v. Commissioner</u>, <u>supra</u>; sec. 20.2031-2(h), Estate Tax Regs.[14]

---

[14] While sec. 20.2031-2(h), Estate Tax Regs., provides that agreements not binding during life will be accorded "little weight", whereas binding-during-life agreements found to be testamentary devices will be "disregarded", this difference in nomenclature carries no practical import.  See, e.g., <u>Hoffman v. Commissioner</u>, 2 T.C. 1160, 1178-1180 (1943) (agreement not binding during life disregarded), affd. sub nom. <u>Giannini v. Commissioner</u>, 148 F.2d 285 (9th Cir. 1945); <u>Estate of Caplan v.</u>

(continued...)

In 1990, section 2703 was enacted. Omnibus Budget Reconciliation Act of 1990 (OBRA), Pub. L. 101-508, sec. 11602(a), 104 Stat. 1388-491. It provides that any agreement to acquire property at less than its fair market value will be disregarded in valuing such property for Federal estate tax purposes unless the agreement satisfies certain requirements enumerated in the statute. Those requirements include the requirements of preexisting law that the agreement be a bona fide business arrangement and not a testamentary device as well as a new requirement that the terms of the agreement be comparable to those of similar arrangements negotiated at arm's length. Sec. 2703(b). Section 2703 applies to agreements created or substantially modified after October 8, 1990. OBRA sec. 11602(e), 104 Stat. 1388-500; sec. 25.2703-2, Gift Tax Regs.

As the legislative history makes clear, section 2703 was intended to supplement, not supplant, the existing legal requirements: "The bill does not otherwise alter the requirements for giving weight to a buy-sell agreement. For example, it leaves intact present law rules requiring that an agreement have lifetime restrictions in order to be binding on

[14](...continued)
Commissioner, T.C. Memo. 1974-39 (to same effect).

death." 136 Cong. Rec. S15683 (daily ed. Oct. 18, 1990).[15]
Thus, regardless of whether section 2703 applies to a buy-sell agreement, the agreement must meet the requirements of the pre-section-2703 law to control value for Federal estate tax purposes.

The parties raise numerous issues regarding the efficacy of the buy-sell agreement at issue here. First, they dispute the terms of the agreement, arguing over the validity and interplay of the 1981 and 1996 Agreements. Second, the parties dispute whether the buy-sell agreement satisfies the requirements of pre-section-2703 law, including the requirement that it be binding during life. Third, the parties dispute whether section 2703 applies to the agreement and, if so, whether the agreement satisfies the requirements of section 2703(b), thus saving the agreement from being disregarded under section 2703(a). We address each issue below.

A.    Terms of the Buy-Sell Agreement

As a threshold matter, we must first determine the terms of the buy-sell agreement at issue. Respondent argues that either

---

[15] Sec. 2703 originated in the Senate version of the Omnibus Budget Reconciliation Act of 1990 (OBRA). H. Conf. Rept. 101-964, at 1133 (1990), 1991-2 C.B. 560, 604. The committee report with respect to the Senate legislation was printed in the Congressional Record, without separate publication, because of time constraints. 136 Cong. Rec. S15629-04 (daily ed. Oct. 18, 1990).

the 1996 Agreement is invalid, in which case it cannot control value because it is not enforceable, see Estate of Carpenter v. Commissioner, T.C. Memo. 1992-653, or the 1996 Agreement is a novation of the 1981 Agreement, in which case the 1996 Agreement stands alone as the operative agreement and is entitled to no weight because it lacks restrictions on lifetime transfers, see sec. 20.2031-2(h), Estate Tax Regs. The estate contends that the 1996 Agreement modifies the 1981 Agreement and that the two agreements must be read together, with the 1981 Agreement's restrictions on lifetime transfers surviving the modification. As all the relevant events occurred in Georgia, and the 1981 Agreement specifies that it will be subject to and governed by the laws of the State of Georgia, we analyze these claims under Georgia law.

Respondent contends the 1996 Agreement is invalid because decedent, a trustee of the ESOP, breached a fiduciary duty to the ESOP participants in entering into the agreement. Respondent argues that, were the ESOP to adopt the $92.85 price per share implicit in the 1996 Agreement, a price almost 50 percent lower than the $164.01 per-share value determined by BVS in its January 31, 1997, appraisal, one-half of BCC's value would disappear, to the detriment of the ESOP participants.

Transactions in BCC stock between the ESOP and other parties, including shareholders and plan participants, must be effected at values established by an independent appraiser. See sec. 401(a)(28)(C). Respondent does not explain the basis on which the ESOP trustees could adopt the per-share value contained in the 1996 Agreement. Nor are we aware of one.[16]

More fundamentally, decedent's agreement to have his BCC shares redeemed at a price that respondent himself urges was below fair market value actually inured to the benefit of the ESOP participants. Before the redemption, the ESOP's 8,692 shares represented approximately 17 percent of the outstanding equity interests in BCC. After the redemption, the ESOP's shares represented 100-percent ownership of BCC. The redemption of decedent's shares at a bargain price left relatively more corporate assets for the ESOP owners than would have been the case at a higher redemption price, thus increasing rather than decreasing the value of the BCC shares held by the ESOP and its participants. Accordingly, respondent's contention that

---

[16] While a subsequent appraisal of BCC's outstanding shares might consider the price at which decedent's BCC shares had been redeemed, such a non-arm's-length sale between a corporation and its controlling shareholder would presumably be disregarded as an indicator of fair market value. Indeed, BVS did not consider either the obligation to redeem decedent's BCC shares or the actual redemption of those shares for $4 million in its 1997 or 1998 appraisal.

decedent's bargain sale of his shares breached a fiduciary duty to the ESOP or its participants is unavailing, and we decline to find the 1996 Agreement invalid on this basis.

Nor do we find the 1996 Agreement to be a novation of the 1981 Agreement. To qualify as a novation, a contract must meet four requirements. There must be: (i) A previous valid contract; (ii) the parties' agreement to a new contract; (iii) the extinguishment of the old contract; and (iv) a valid new contract. Savannah Bank & Trust Co. v. Wolff, 11 S.E.2d 766, 772 (Ga. 1940). Here, the key question is whether the 1996 Agreement extinguished the 1981 Agreement. To satisfy this element, either a mutual intent to create a novation must be shown, Mayer v. Turner, 234 S.E.2d 853 (Ga. Ct. App. 1977), or the later inconsistent agreement must be one that "completely cover[s] the subject matter" of the prior agreement, Powell v. Norman Elec. Galaxy, Inc., 493 S.E.2d 205, 207 (Ga. Ct. App. 1997). We consider each of these possibilities in turn.

Respondent argues that the 1996 Agreement's lack of any express intent to modify the 1981 Agreement requires an inference that decedent intended to extinguish the 1981 Agreement by entering into the 1996 Agreement. We disagree. First, we are unaware of any rule requiring that a modification to a contract explicitly indicate it is intended as such. Second, that some

essential terms of the 1981 Agreement were supplanted, while others were ignored, supports the inference that only those terms addressed were meant to be changed.  Third, the 1981 Agreement expressly stated that it superseded earlier agreements.  As it is apparent from the title, structure, and language of the two agreements that decedent drew upon the 1981 Agreement in drafting the 1996 Agreement, the absence of such an express revocation in the latter agreement suggests that decedent did not intend to supplant the 1981 Agreement in its entirety.  Finally, decedent was not an attorney and did not consult one when he drafted the 1996 Agreement.  In these circumstances, we are persuaded that a layman in decedent's circumstances would more likely assume that entering into an agreement inconsistent with one section of an earlier agreement would result in a modification, and not a termination, of the earlier agreement.

Respondent further argues that because the 1996 Agreement "eclipsed the terms" of the 1981 Agreement, it necessarily extinguished the 1981 Agreement, regardless of decedent's intent. We disagree.  Under Georgia law, a prior agreement will be extinguished where a later inconsistent agreement completely covers the subject matter of the prior agreement.  Id.  The 1996 Agreement did not cover several matters covered in the 1981 Agreement, most notably the restrictions on the lifetime transfer

of BCC shares.  Accordingly, we find that the 1996 Agreement did not completely cover the subject matter of the 1981 Agreement, so as to extinguish it.

For the foregoing reasons, we conclude that under Georgia law, the 1996 Agreement did not effect a novation of the 1981 Agreement, but rather a modification thereof.[17]  Thus, the two agreements must be read together and constitute the Modified 1981 Agreement.

B.    Binding-During-Life Requirement

Before turning to the questions of whether section 2703 applies to the Modified 1981 Agreement and whether the agreement is disregarded thereunder, we first consider whether the Modified 1981 Agreement satisfies the requirements of pre-section-2703 law that a buy-sell agreement, to be respected for purposes of Federal estate tax value, must be binding not just at death, but also during the decedent's lifetime.  See, e.g., Estate of Matthews v. Commissioner, 3 T.C. 525 (1944); Hoffman v. Commissioner, 2 T.C. 1160, 1179 (1943), affd. sub nom. Giannini

---

[17] If the 1996 Agreement were construed to be a novation of the 1981 Agreement, the 1996 Agreement would not meet the binding-during-life requirement of sec. 20.2031-2(h), Estate Tax Regs., because the 1996 Agreement contained no provisions restricting lifetime transfers of BCC stock.  Accordingly, it would be disregarded in determining the value of decedent's BCC stock for Federal estate tax purposes.

v. Commissioner, 148 F.2d 285 (9th Cir. 1945); sec. 20.2031-2(h), Estate Tax Regs.

The 1981 Agreement provided that no "Shareholder" could transfer his BCC shares without the written consent of the other "Shareholders."[18]  Because the 1996 Agreement was not a novation but merely a modification of the 1981 Agreement, the latter's provision requiring "Shareholders" to consent to any lifetime transfer of BCC shares survived.  The estate argues that the Modified 1981 Agreement was binding during decedent's life because any lifetime transfer of decedent's BCC shares required the consent of other shareholders; namely, the ESOP.  Respondent argues that the requirement of shareholder consent was not sufficient to satisfy the binding-during-life requirement, and, in any event, the ESOP's consent was not a meaningful restriction

---

[18] The 1981 Agreement also set forth an endorsement that was required to be placed on BCC's stock certificates.  The endorsement cross-referenced the 1981 Agreement's requirement of shareholder consent to transfers of stock, and, in addition, provided that shares must first be offered for sale to BCC and other shareholders before being offered or sold to third parties.
There is no evidence in the record that this endorsement was actually placed on any BCC stock certificate; the only certificates in the record do not contain it, and the parties have not addressed it.  In any event, since the mandated endorsement cross-referenced the requirement of shareholder consent to transfers, we conclude that the endorsement's additional reference to a right of first refusal in no way derogates the requirement of shareholder consent.

on decedent's ability to transfer shares during his lifetime because decedent could have caused the ESOP to consent.

We note that the term "Shareholders" is initially defined in the 1981 Agreement as decedent and Mr. Jennings, and thus would exclude the ESOP. If the term "Shareholders" were construed to exclude the ESOP, then decedent would not have been required to obtain the ESOP's consent before making a lifetime transfer of his BCC shares, and the Modified 1981 Agreement would fail to satisfy the binding-during-life requirement. However, the term "Shareholders" was used later in section 3(a) of the 1981 Agreement to denote persons other than decedent or Mr. Jennings, who received shares directly from BCC or as transferees from other shareholders, thus creating an ambiguity. In construing the 1981 Agreement, we must consider the agreement as a whole. See Ga. Code Ann. sec. 13-2-2(4) (2001); Sachs v. Jones, 63 S.E.2d 685 (Ga. Ct. App. 1951). The agreement's preamble contemplated additional shareholders and provided that one of the purposes of the agreement was to ensure that such shareholders "benefit from and be bound by" the agreement. Construing the 1981 Agreement to allow lifetime transfers without the consent of subsequent shareholders would thwart the agreement's express purpose of bestowing its benefits on all shareholders equally. Consequently, we are persuaded that the term "Shareholders" was

intended to encompass subsequent shareholders and conclude that the 1981 Agreement required the consent of subsequent shareholders (i.e., the ESOP) to any lifetime transfer of shares.[19]

While we agree with the estate that a requirement of shareholder consent to lifetime transfers may be a sufficient restriction to render a buy-sell agreement binding during life,[20] see Estate of Weil v. Commissioner, 22 T.C. at 1275, we nevertheless do not agree that the Modified 1981 Agreement was binding during decedent's lifetime because decedent had the unilateral ability to amend it.

Where a decedent had the unilateral ability to change a buy-sell agreement while alive, the agreement will not be considered binding during his lifetime and, therefore, cannot control value for Federal estate tax purposes. Bommer Revocable Trust v. Commissioner, T.C. Memo. 1997-380; see also Estate of True v. Commissioner, T.C. Memo. 2001-167. In Bommer, the buy-sell

---

[19] We note that this interpretation is consistent with respondent's assumption implicit in his alternate argument that the consent requirement was not meaningful because decedent could require the ESOP to give consent.

[20] Respondent's argument regarding decedent's ability to cause the ESOP to consent may overlook possible fiduciary obligations of the ESOP's trustees. Regardless, we need not consider it further in light of our conclusion, on other grounds, infra, that the Modified 1981 Agreement was not binding during decedent's lifetime.

agreement contained a valid restriction on lifetime transfers.[21]
However, it also expressly gave any shareholder owning 75 percent
of the shares the right to amend the agreement.  The decedent
owned over 75 percent when the agreement was drafted and at all
times thereafter.[22]  Because the decedent had the unilateral
ability to amend the agreement, we concluded that the agreement
was not binding during his lifetime and disregarded it for
purposes of determining the stock's value for Federal estate tax
purposes.  We expressly rejected a claim that the decedent's
ability to modify the agreement was limited by a fiduciary duty
he owed as a majority shareholder to the minority shareholders.

In Estate of True, the decedent was a party to a buy-sell
agreement, along with other shareholders and the corporation in
which they held stock.  The decedent had a controlling interest
in the corporation.  The Commissioner argued that the agreement
was not binding during the decedent's lifetime because he had the
unilateral ability to amend the agreement by virtue of his

---

[21] The agreement required any shareholder wishing to sell
his shares to offer those shares first to the corporation at the
same price payable upon his death.

[22] The agreement was later amended to increase the
percentage of outstanding shares required to confer unilateral
amendment rights to an amount just exceeding the amount directly
owned by the decedent.  However, additional shares deemed owned
by the decedent through attribution caused him to satisfy the
amended higher percentage requirement.  Bommer Revocable Trust v.
Commissioner, T.C. Memo. 1997-380.

control of the corporation.  We rejected that argument because there were other shareholders whose consent was required to amend the agreement.  Thus, control of the corporation did not, under those facts, give the decedent the unilateral ability to amend the agreement.

In the instant case, the 1981 Agreement provided that it could be modified only by the written consent of the "parties thereto".  The agreement contained no mechanism for adding parties.  Thus, after Mr. Jennings died and his shares were redeemed, decedent and BCC were the only remaining parties.[23] Moreover, decedent owned shares constituting a controlling 83.2-percent interest in BCC.  Consequently, after Mr. Jennings's

---

[23] Because persons who became BCC shareholders after the 1981 Agreement was executed were fully subject to the restrictions on the transfer of BCC's shares established in that agreement, an argument could be made that such subsequent shareholders--in particular, the ESOP--were "parties" to the 1981 Agreement.  In contending that the 1996 Agreement validly modified the 1981 Agreement and set the purchase price of decedent's BCC shares at $4 million, the estate has necessarily taken the position (and respondent does not dispute) that the ESOP was not a "party" to the 1981 Agreement and that its consent was not required to make modifications thereto.

If, alternatively, "party" for purposes of the modification provision of the 1981 Agreement were interpreted to include subsequent shareholders like the ESOP, then the 1996 Agreement on which the estate relies in this case as establishing the value of decedent's BCC shares would be an invalid modification (because it would lack the consent of all "parties").  As a consequence, the 1981 Agreement in its unmodified form would presumably survive.  However, the estate has not argued in the alternative that the (unmodified) 1981 Agreement established the value of decedent's shares, and we deem that argument waived.

death, decedent, by virtue of his control of BCC, could (and did) unilaterally modify the 1981 Agreement.

Decedent did not obtain the consent of the remaining BCC shareholder, i.e., the ESOP, in connection with the modification of the 1981 Agreement, demonstrating that decedent, BCC, and the estate in its arguments herein took the position that the consent of only decedent and BCC was required. Because no other shareholder had to consent to a modification of the 1981 Agreement (original or modified), unlike the circumstances in Estate of True v. Commissioner, supra, control over the corporation here gave decedent the unilateral ability to modify the 1981 Agreement. Thus, consistent with Bommer Revocable Trust v. Commissioner, supra, the restrictions in the Modified 1981 Agreement were not binding on decedent during his life. Accordingly, the Modified 1981 Agreement is disregarded for purposes of determining the value of the BCC shares held by decedent at death.

C.   Section 2703

Even if the Modified 1981 Agreement satisfied the binding-during-life requirement, the agreement would nonetheless be disregarded under section 2703.

### 1. Applicability of Section 2703

Section 2703 applies to agreements entered into or substantially modified" after October 8, 1990.  OBRA sec. 11602(e); sec. 25.2703-2, Gift Tax Regs.  A "substantial modification" for this purpose is further defined in section 25.2703-1(c)(1), Gift Tax Regs., which provides that

> Any discretionary modification of a right or restriction, whether or not authorized by the terms of the agreement, that results in other than a de minimis change to the quality, value, or timing of the rights of any party with respect to property that is subject to the right or restriction is a substantial modification.  * * *

The 1981 Agreement required BCC to purchase, and a deceased shareholder's estate to sell, the deceased shareholder's BCC shares at a price initially set at the book value of the shares being redeemed.  This price automatically adjusted each year to reflect increases in book value.  The 1981 Agreement allowed the shareholders by agreement to set a different price annually on August 1.  Thus, any shareholder could preserve the book value redemption price by refusing to agree to reset the price.  Assuming the parties did agree to change the purchase price on August 1, absent further adjustment by agreement of the shareholders, the new price would automatically adjust annually on the basis of increases in BCC's book value.  BCC had the right to pay for the redeemed stock in installments.

Because BCC's shareholders had not exercised their right to reset the purchase price, when decedent modified the 1981 Agreement in November 1996, the price dictated under that agreement was set by reference to book value. Thus, had decedent died during the fiscal year in which he modified the 1981 Agreement, he would have received approximately $7.6 million for his BCC shares under the 1981 Agreement in unmodified form.

The 1996 Agreement modified the "Purchase Upon Death" section of the 1981 Agreement by (1) eliminating book value as the redemption price for decedent's shares and replacing it instead with a fixed price of $4 million, (2) removing the automatic mechanism for adjusting the price annually on the basis of book value, (3) eliminating the shareholders' right to set the price annually on August 1, and (4) precluding the right of BCC to pay in installments.

The estate raises several arguments as to why these changes are not substantial modifications. Focusing first on the change in price, the estate argues that the setting of a new price in the 1996 Agreement was not a change in shareholder rights because the 1981 Agreement gave the shareholders the ability to change the price, and thus the price change was "in compliance with the agreement." We disagree. As set forth in the regulations, the validity of which has not been challenged, even if a change is

authorized by the agreement at issue, if it results in a non-de minimis change in the value, quality, or timing of the right at issue, it will be deemed a substantial modification.  Sec. 25.2703-1(c)(1), Gift Tax Regs.  Assuming, arguendo, that a price change made on a date other than August 1, and without the consent of all shareholders, was in compliance with the 1981 Agreement, decedent's change in the price is a substantial modification under the regulations if it produced more than a de minimis change in value.  Before the modification, decedent had the right to have his shares redeemed on the basis of BCC's book value from the most recent fiscal yearend, which in November 1996 would have yielded a purchase price for his shares of $7.6 million (based on the January 31, 1996, fiscal yearend book value of $9,135,506).  After the modification, he had the right to have his shares redeemed at $4 million.  Conversely, BCC's redemption obligation changed from $7.6 to $4 million.  We conclude that this is a non-de minimis change in the value of decedent's and BCC's rights with respect to decedent's BCC shares.

The estate further argues that the quality of the right was not changed by virtue of decedent's designation of a $4 million purchase price because it falls under an exception listed in section 25.2703-1(c)(2), Gift Tax Regs.  Section 25.2703-1(c)(2)(iv), Gift Tax Regs., provides that "A modification that

results in an option price that more closely approximates fair market value" is de minimis. The estate asserts that the book value price under the 1981 Agreement for decedent's shares at the time of the 1996 modification was $4.2 million. It further asserts that the fair market value of decedent's shares at the time of the modification was $3,736,242, as demonstrated by the 1996 BVS appraisal. The estate claims that the change in price of decedent's shares from $4.2 to $4 million thus qualifies as de minimis under section 25.2703-1(c)(2)(iv), Gift Tax Regs., because it results in a price that more closely reflected the fair market value of decedent's BCC shares.

Assuming, arguendo, that the purchase price in the 1981 Agreement is an "option price", this argument fails because the estate's calculation of BCC's book value and fair market value at the time of the modification is flawed. In calculating the book value price for decedent's BCC shares under the 1981 Agreement, the estate's argument assumes that BCC had 92,718 shares outstanding. At the time decedent modified the 1981 Agreement, however, BCC had redeemed Mr. Jennings's shares, and there were only 51,772 shares outstanding. Dividing BCC's book value as of January 31, 1996 ($9,135,506),[24] by the actual number of shares

---

[24] While the Jan. 31, 1996, book value would not reflect BCC's transfer of $1,990,791 in cash and a $1 million note to Mr.

(continued...)

outstanding produces a per-share value of $176.46, which yields a book value for decedent's 43,080 shares of approximately $7.6 million, not the $4.2 million contended by the estate.[25]

Similarly, when the estate contends that the 1996 BVS appraisal suggested that the fair market value of decedent's BCC shares was $3,736,242, its calculation is likewise based on the erroneous assumption that BCC had 92,718 shares outstanding as of November 1996. Thus, the estate's argument overlooks the redemption of Mr. Jennings's shares and incorrectly assumes a per-share fair market value of $86.73. Taking the redemption of Mr. Jennings's shares into account yields a per-share fair market value of $155.32, the same figure BCC's controller, Mr. Truono, used in his November 1996 analysis of BCC's financial condition (i.e., Pro Forma 15). Using this corrected figure to calculate

---

[24](...continued)
Jennings's estate for the redemption of his shares in September 1996, BCC had received approximately $3 million in life insurance proceeds upon Mr. Jennings's death, which essentially offset the foregoing transfers for purposes of book value.

[25] Even if the 1981 Agreement were interpreted to require the calculation of BCC's per-share book value as of Jan. 31, 1996, using the number of shares outstanding at that date, i.e., 92,718, resulting in a purchase price of approximately $4.2 million (as the estate contends), the 1996 modification would still have produced a non-de minimis change in the value of decedent's rights because the per-share price for decedent's shares under the 1981 Agreement would have automatically adjusted at the close of the fiscal year ended Jan. 31, 1997, to reflect the reduction in outstanding shares to 51,772 after the redemption of Mr. Jennings's shares.

the value of decedent's 43,080 BCC shares suggests that those shares were worth approximately $6.7 million in November 1996. Thus, the 1996 Agreement's change in the price for decedent's BCC shares did not result in a change in price that more closely approximated fair market value.

In addition to the changes in the value and quality of the rights wrought by the change in price, the 1996 modification worked other substantial changes to the 1981 Agreement.  Under the 1981 Agreement, the redemption price was based on book value.  Moreover, the ESOP had the right to insist on book value as the basis for any redemption by refusing to agree to reset the price.  It further was entitled to have the price automatically adjusted to reflect changes in book value.  Decedent eliminated the ESOP's rights in this regard when he modified the 1981 Agreement.  He also extinguished BCC's right to pay the redemption price in installments, as provided in the 1981 Agreement.

We find that the foregoing changes are more than de minimis and that they substantially altered decedent's, BCC's, and the ESOP's rights with respect to the stock covered by the agreement, including the value, quality, and timing of those rights. Accordingly, we conclude that the 1996 Agreement substantially modified the 1981 Agreement.  Insofar as this substantial modification occurred after October 8, 1990, the Modified 1981

Agreement is subject to section 2703. See OBRA sec. 11602(e); sec. 25.2703-2, Gift Tax Regs.

2. Section 2703(b)(3)

Section 2703(a) provides that in general any agreement or right to acquire property at a price less than its fair market value will be disregarded in valuing the property for Federal estate tax purposes. Section 2703(b) creates an exception to the operation of section 2703(a), as follows:

SEC. 2703. CERTAIN RIGHTS AND RESTRICTIONS DISREGARDED.

(b) Exceptions.--Subsection (a) shall not apply to any option, agreement, right, or restriction which meets each of the following requirements:

(1) It is a bona fide business arrangement.

(2) It is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth.

(3) Its terms are comparable to similar arrangements entered into by persons in an arms' length transaction.

The estate contends that, in the event section 2703(a) applies to the Modified 1981 Agreement, all three requirements of section 2703(b) have been met. Respondent disagrees. For the reasons set forth below, we agree with respondent.

With respect to the requirement of section 2703(b)(2), the beneficiaries of a below-market redemption of decedent's BCC shares were the remaining BCC shareholders, namely the ESOP

participants, who were BCC's employees and not members of decedent's family. We are persuaded that the ESOP participants, who had no personal relationship with decedent outside of work, were not the natural objects of decedent's bounty. Thus, the Modified 1981 Agreement is not a device to pass decedent's BCC shares to either his family or the natural objects of his bounty for less than adequate consideration, and the estate has satisfied section 2703(b)(2).[26]

We need not decide whether decedent's designation of a below-market redemption price for his shares in the Modified 1981 Agreement, which was based on his understanding of BCC's available cash after accounting for operational cash needs and the obligation to repurchase the shares of the ESOP participants, constitutes a bona fide business arrangement under section 2703(b)(1), because we conclude that the estate has not shown

---

[26] Sec. 2703(b)(2) uses the term "family", while sec. 25.2703-1(b)(1)(ii), Gift Tax Regs., uses the term "natural objects of the transferor's bounty" when referring to transferees of property for less than adequate consideration. Sec. 20.2031-2(h), Estate Tax Regs., also uses the term "natural objects of * * * [the transferor's] bounty". Legislation amending sec. 2703(b)(2) to conform the statute's language to the regulations has twice been passed in the House of Representatives, but never enacted. See 137 Cong. Rec. 35312, 35323 (1991); 138 Cong. Rec. 17691, 17729 (1992); H. Rept. 102-631, at 326 (1992). Because we find that the ESOP participants were neither decedent's family nor the natural objects of his bounty, we do not reach the question of whether these terms should be treated as synonymous for purposes of sec. 2703.

that the terms of the Modified 1981 Agreement are comparable to similar agreements entered into by persons at arm's length, as required by section 2703(b)(3).

Section 2703(b)(3) provides that the terms of a buy-sell agreement must be "comparable to similar arrangements entered into by persons in an arms' length transaction."  Section 2703(b)(3) appears to contemplate a taxpayer's production of evidence of agreements actually negotiated by persons at arm's length under similar circumstances and in similar businesses that are comparable to the terms of the challenged agreement.

The legislative history supports this interpretation.  The committee report from the Senate, where section 2703 originated, states:

> In addition, the bill adds a third requirement, not found in present law, that the terms of the option, agreement, right or restrictions be comparable to similar arrangements entered into by persons in an arm's length transaction.  This requires that the taxpayer show that the agreement was one that could have been obtained in an arm's length bargain.  Such determination would entail consideration of such factors as the expected term of the agreement, the present value of the property, its expected value at the time of exercise, and the consideration offered for the option.  It is not met simply by showing isolated comparables but requires a demonstration of the general practice of unrelated parties.  Expert testimony would be evidence of such practice.  In unusual cases where comparables are difficult to find because the taxpayer owns a unique business, the taxpayer can use comparables from similar businesses.  [136 Cong. Rec. S15683 (daily ed. Oct. 18, 1990).]

Thus, Congress contemplated that business "comparables" that established "the general practice of unrelated parties" would constitute the evidence satisfying section 2703(b)(3), and that "expert testimony" could be used for this purpose.

The regulations under section 2703 also contemplate the introduction of evidence of actual comparable transactions. Section 25.2703-1(b)(4), Gift Tax Regs., provides in relevant part:

> (4) <u>Similar arrangement</u>. (i) <u>In general</u>. A right or restriction is treated as comparable to similar arrangements entered into by persons in an arm's length transaction if the right or restriction is one that could have been obtained in a fair bargain among unrelated parties in the same business dealing with each other at arm's length. A right or restriction is considered a fair bargain among unrelated parties in the same business if it conforms with the general practice of unrelated parties under negotiated agreements in the same business. * * *

> (ii) <u>Evidence of general business practice</u>. Evidence of general business practice is not met by showing isolated comparables. * * * It is not necessary that the terms of a right or restriction parallel the terms of any particular agreement. If comparables are difficult to find because the business is unique, comparables from similar businesses may be used.

In light of the statutory language, the legislative history, and the regulations, we conclude that section 2703(b)(3) requires a taxpayer to demonstrate that the terms of an agreement providing for the acquisition or sale of property for less than fair market value are similar to those found in similar

agreements entered into by unrelated parties at arm's length in similar businesses.  In the instant case, the estate must demonstrate that the terms of the Modified 1981 Agreement are similar to terms in agreements entered into by unrelated parties in businesses similar to that of BCC.

The only evidence proffered by the estate on this point was the expert report and testimony of Mr. Grizzle.  Mr. Grizzle opined that the terms of the Modified 1981 Agreement were comparable to similar arrangements entered into at arm's length within the meaning of section 2703(b)(3) because the price provided in the agreement for decedent's BCC shares was fair market value.[27]  His conclusion regarding BCC's fair market value was based upon an income approach in which he postulated that BCC's value was equal to a multiple of four times earnings.  He claimed that such a multiple was commonly used to value construction companies by those knowledgeable about the industry. He further claimed that such a multiple was implicit in the sale prices for three purportedly comparable companies he examined. He did not present evidence of other buy-sell agreements or similar arrangements, where a partner or shareholder is bought

_____

[27] Mr. Grizzle opined that $4 million was a fair market value price for the shares as of either the date of execution of the 1996 Agreement (Nov. 11, 1996) or the date of decedent's death (Sept. 21, 1997).

out by his coventurers, actually entered into by persons at arm's length.  Nor did he attempt to establish that the method decedent used to arrive at his $4 million price was similar to the method employed by unrelated parties acting at arm's length.

If Mr. Grizzle were correct regarding the fair market value of decedent's BCC shares, section 2703(a) would not be triggered, insofar as it applies only to those agreements that set a price below fair market value, and no evidence of similar arrangements would be required.  For the reasons discussed below, however, Mr. Grizzle has failed to persuade us that the purchase price for decedent's BCC shares set forth in the Modified 1981 Agreement was a fair market price, either when selected or at decedent's death.  Rather, we are persuaded that the price set forth in the Modified 1981 Agreement is far below fair market value.  Because Mr. Grizzle has failed to provide any evidence of similar arrangements actually entered into by parties at arm's length, as required by section 2703(b)(3), and his opinion is based solely on his belief that the purchase price for decedent's BCC shares was set at fair market value, Mr. Grizzle's conclusion that the terms of the Modified 1981 Agreement are comparable to similar agreements entered into by parties at arm's length is unsupportable.

In determining BCC's value, Mr. Grizzle relied solely on an income-based approach. Mr. Fodor, the estate's other expert, asserted that 25 percent of BCC's value should be determined using an asset-based approach. Mr. Hitchner, respondent's expert, asserted that BCC's value should be calculated by giving significant weight to an asset-based approach. We are persuaded by their testimony that some weight should be given to an asset approach. BCC was an asset-rich company, with significantly more cash than similar companies. Decedent's shares represented a controlling interest in the company, thus allowing a purchaser to control the retention or disposition of those assets. Thus, Mr. Grizzle's reliance on an income-based approach alone, without regard to the company's assets, raises doubt about his valuation judgments.

Even if we assume that an income-based approach alone were appropriate here, Mr. Grizzle excluded nonoperating assets from his valuation, on the theory that, in actual transactions, sellers do not sell nonoperating assets along with the operating assets. Thus, he envisioned decedent selling BCC's operating assets only, while retaining its nonoperating assets. The purchase price set forth in the Modified 1981 Agreement, however, was for decedent's interest in BCC's operating and nonoperating assets. As discussed infra in Part II.C.3., BCC had

approximately $1.9 million of nonoperating assets (ignoring

insurance proceeds the company was due to receive on decedent's

death). Had Mr. Grizzle valued all of BCC's assets, and not just

the operating assets, he would have valued BCC at over $6

million, as opposed to the $4.5 million value he calculated using

a multiple of four times adjusted cashflow. With this adjustment

alone, Mr. Grizzle's estimation of the fair market value of

decedent's shares would rise from approximately $3.8 million to

over $5 million, thus undermining any claim that the $4 million

purchase price in the Modified 1981 Agreement was a fair market

value price.[28]

In light of these concerns, we assign no weight to Mr.

Grizzle's testimony that the $4 million purchase price set forth

---

[28] In addition, we are unpersuaded regarding Mr. Grizzle's
estimation of BCC's fair market value because his purportedly
comparable companies differed significantly from BCC. For
instance, the cellular tower construction company he used as a
comparable was 2 years old with minimal cash and assets. It was
in a new industry that was rapidly evolving. Moreover, it
depended on three customers for 86 percent of its contract
revenues, with one customer accounting for 48 percent of those
revenues. This is a far cry from BCC, which had been in business
for more than 50 years, operated in a stable industry, obtained
business from numerous sources, and had significant cash and
assets. In two cases, Mr. Grizzle relied on financial data
generated after the companies were sold to determine the cashflow
multiple implicit in the sale prices. In each case, the use of
this data served to decrease the multiple he determined. Thus,
we are not persuaded by Mr. Grizzle's conclusion that BCC should
be valued using the same multiple of cashflow reflected in the
sales of these companies or that the multiples he derived are
accurate.

in the Modified 1981 Agreement was a fair market price value. Accordingly, his conclusion that the Modified 1981 Agreement established a price comparable to those of similar arrangements entered into at arm's length by people in similar businesses is flawed.

While we do not doubt that a corporation's redemption of a shareholder's stock that is subject to a restrictive agreement, as here, might well occur at an arm's-length price less than fair market value, the failure of Mr. Grizzle's proof leaves us only to speculate as to what such a below-fair-market-value, yet arm's-length, price might be. Decedent set a price in the 1996 Agreement that he believed was the most BCC could pay without impairing its liquidity. But this $4 million price was reached between decedent and his controlled corporation, with the remaining shareholder excluded. The best evidence we have on this record of an arm's-length arrangement involving the BCC stock is the unmodified 1981 Agreement, which was negotiated between decedent and his brother-in-law when both were 50-percent shareholders and neither knew who would survive the other. The redemption price set in that agreement was (i) book value or (ii) whatever price these two shareholders, in relatively equal bargaining positions, could annually agree upon. Given the disparity in the prices dictated in the 1981 Agreement versus the

1996 Agreement, we have no confidence that the 1996 Agreement was comparable to an arm's-length bargain.

Insofar as the estate has failed to persuade us that the Modified 1981 Agreement has met the requirements of section 2703(b)(3), the Modified 1981 Agreement must also be disregarded under section 2703(a) when determining the value of decedent's BCC shares for Federal estate tax purposes.

II.  Valuation of Decedent's BCC Shares

Having determined that the Modified 1981 Agreement cannot control the value of decedent's BCC stock for Federal estate tax purposes, we turn next to the task of determining its fair market value as of the valuation date.  In the notice of deficiency, respondent determined that decedent's 43,080 BCC shares had a fair market value of $7,921,975.  The burden of proof rests with the estate to demonstrate that respondent's determination is erroneous.[29]  See Rule 142(a).

A.  Fair Market Value

Valuation is a question of fact, and the trier of fact must weigh all relevant evidence to draw the appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. Natl. Grocery Co., 304 U.S. 282,

---

[29] The estate has not raised sec. 7491, which would shift the burden of proof under certain circumstances.  Accordingly, we deem that issue waived.

294-295 (1938); <u>Anderson v. Commissioner</u>, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part on other grounds T.C. Memo. 1956-178; <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. 193, 217 (1990); <u>Skripak v. Commissioner</u>, 84 T.C. 285, 320 (1985).

Fair market value is defined for Federal estate tax purposes as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the relevant facts. <u>United States v. Cartwright</u>, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.; see also <u>Snyder v. Commissioner</u>, 93 T.C. 529, 539 (1989); <u>Estate of Hall v. Commissioner</u>, 92 T.C. 312, 335 (1989).

B.    <u>Expert Testimony</u>

Both parties submitted expert reports and testimony in support of their asserted fair market values for decedent's BCC stock on the valuation date.[30]  When considering expert testimony regarding valuation, we weigh the testimony in light of the

---

[30] The estate proffered Mr. Grizzle as an expert both with respect to the issue of compliance with sec. 2703(b)(3) and with respect to the fair market value of decedent's shares.  For the reasons outlined <u>supra</u> in Pt.I.C.2., we conclude that Mr. Grizzle's expert opinion concerning the value of decedent's shares is unreliable and assign it no weight.  Our discussion hereinafter considers only the fair market value opinions of Messrs. Fodor and Hitchner.

expert's qualifications and with due regard to all other credible evidence in the record.  See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 85 (2000), affd. 299 F.3d 221 (3d Cir. 2002).  An expert's testimony is no more persuasive than the convincing nature of the reasons offered in support of his testimony.  Potts, Davis & Co. v. Commissioner, 431 F.2d 1222, 1226 (9th Cir. 1970), affg. T.C. Memo. 1968-257.  We may embrace or reject an expert's opinion in its entirety, or be selective in choosing portions of the opinion to adopt.  See Helvering v. Natl. Grocery Co., supra at 294-295; Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); Parker v. Commissioner, 86 T.C. 547, 562 (1986); see also Pabst Brewing Co. v. Commissioner, T.C. Memo. 1996-506.  We may reject an expert's opinion to the extent that it is contrary to the judgment we form on the basis of our understanding of the record as a whole.  See Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985); Silverman v. Commissioner, supra; Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; IT&S of Iowa, Inc. v. Commissioner, supra; Chiu v. Commissioner, 84 T.C. 722, 734 (1985); see also Gallick v. Baltimore & O.R. Co., 372 U.S. 108, 115 (1963); In re TMI Litig., 193 F.3d 613, 665-666 (3d

Cir. 1999).  Finally, because valuation necessarily involves an approximation, the figure at which we arrive need not be directly attributable to specific testimony if it is within the range of values that properly may be derived from consideration of all the evidence.  Estate of True v. Commissioner, T.C. Memo. 2001-167 (citing Silverman v. Commissioner, supra at 933).

C.   BCC's Value Exclusive of Insurance Proceeds

1.   Experts' Concluded Value Exclusive of Insurance Proceeds

Putting aside their treatment of the insurance proceeds on decedent's life, Messrs. Fodor and Hitchner determined BCC's value to be $6 million and $7 million, respectively.  Both used a blend of income- and asset-based approaches.  For their income-based approach, both experts used a capitalization of earnings model, in which they estimated BCC's net free cashflow capacity for the year following the valuation date, capitalized that figure to derive capitalized earnings, and then made various, but different, additions to and subtractions from capitalized earnings.  They relied primarily on BCC's net asset value for their asset-based valuations.

Mr. Fodor determined that BCC had an income-based value of $5,803,163 and an asset-based value of $7,928,805.  He weighted the income-based approach at 75 percent and the asset-based approach at 25 percent to arrive at his $6 million figure.

Mr. Hitchner estimated the income-based value for BCC as ranging from $4,803,513 to $6,403,513, without indicating where in the range he believed the income-based value fell. He also provided a range of values under two different asset-based approaches: The adjusted book value and modified adjusted book value approaches. The values provided for the adjusted book value approach were $8,891,024 and $8,478,254 for the fiscal years ended 1997 and 1998, respectively. The values provided for the modified adjusted book value approach were $7,596,838 and $7,052,766 for the fiscal years ended 1997 and 1998, respectively. As with the income-based approach, Mr. Hitchner did not indicate where in the ranges he believed the asset-based value fell. To derive his final value for BCC, Mr. Hitchner indicated that he gave the most weight to the modified adjusted book value approach, and equal but lesser weight to the income and the adjusted book value approaches. He did not disclose the precise weighting for each approach. Mr. Hitchner's "concluded" value for BCC was $7 million.

Upon a careful review of the entire record, we are persuaded that, exclusive of their respective treatments of the proceeds from decedent's life insurance, each expert's analysis contains a miscalculation of sufficient magnitude that it requires adjustment in reaching a final value. With respect to Mr. Fodor,

as more fully discussed below we conclude that he has not shown that a $750,000 downward adjustment in BCC's value is required to account for the obligation to repurchase BCC shares held by BCC's ESOP participants. With respect to Mr. Hitchner, while we agree with his analysis that BCC held cash and cash equivalents in excess of business needs, and that such "excess cash" should be accounted for as a nonoperating asset, we conclude for the reasons outlined below that he overestimated the amount of BCC's excess cash by approximately $400,000, which caused his figure for BCC's nonoperating assets (exclusive of life insurance proceeds) to be overstated by that amount. Because, under Mr. Hitchner's approach, nonoperating assets were added to capitalized earnings to derive an income-based value, Mr. Hitchner's income-based value is likewise overstated by approximately $400,000 as a result of his overestimate of BCC's excess cash.

   2.  Mr. Fodor's Adjustment for ESOP Repurchase Obligation

   Mr. Fodor adjusted both his income- and asset-based values downward by $750,000 to account for the obligation to repurchase BCC shares held by BCC's ESOP participants. Mr. Fodor derived his $750,000 estimate of the present value of the obligation to repurchase the ESOP participants' shares by adopting the $750,000 estimate of BCC's liability in the event of an ESOP plan

<u>termination</u> that BVS made in its 1997 appraisal of BCC for purposes of the ESOP. While Mr. Fodor provided an analysis at trial in support of his use of the BVS termination liability estimate for this purpose, neither his written report nor his trial testimony offered any analysis of how BCC would satisfy any ESOP repurchase obligation or how the method employed to satisfy the obligation would affect the fair market value of BCC or decedent's BCC shares.

According to a business valuation treatise on which both parties relied in this case, there are two methods that companies generally use to satisfy the obligation to repurchase the shares of retiring ESOP participants: (i) A so-called recycling transaction, in which the ESOP purchases the shares of retiring participants and "recycles" them to other participants, using employer contributions to the ESOP to fund its purchases; or (ii) a redemption transaction, in which the company directly purchases (and then cancels) the shares of retiring participants. See Pratt et al., Valuing a Business 712-713 (2000). Mr. Fodor does not explain or even disclose which method he assumed BCC would employ. The available evidence in the record--namely, the Summary Plan Description for the ESOP--indicates that BCC's ESOP was designed to employ the redemption method. Assuming that is the case, the redemption method's "net effect on fair market

value should be negligible if the * * * [repurchase] transaction occurs at fair market value", id. at 713, because the percentage ownership of all the remaining shareholders increases as a result of the redemption and cancellation of the retiree's shares, id. Mr. Fodor has failed to take into account the proportionate increase in the ownership interest of decedent's shares, which would be produced by the redemption of the ESOP's shares, when considering the impact of the ESOP repurchase obligation on the fair market value of decedent's BCC shares.[31] Nor has he demonstrated that the projected annual ESOP repurchase obligation (as opposed to the present value figure he discussed) would adversely affect BCC's liquidity, thus potentially affecting fair market value.[32]

Alternatively, if it were assumed that BCC employed a "recycling" method, Mr. Fodor has not explained whether or how

---

[31] A simplified example will illustrate this point. If a corporation has $100 in assets and two shareholders (A and B), with A owning 80 percent of the stock and B, an ESOP, owning the remaining 20 percent, a willing buyer of A's shares would pay $80 for those shares, regardless of whether the corporation is obligated to redeem B's shares at their fair market value.

[32] While Mr. Truono testified that he and decedent were concerned when creating Pro Forma 15 that BCC have enough cash available after the purchase of decedent's shares to redeem shares held by ESOP participants, this analysis was in the context of determining how much cash the company could afford to pay decedent's estate to repurchase decedent's BCC shares. Their concerns do not suggest that the ESOP repurchase obligation would have a significant impact on the fair market value of decedent's shares.

BCC's annual contributions to the ESOP (which he elsewhere accounted for as a deduction against earnings to be capitalized) would be insufficient to satisfy some or all of the ESOP repurchase obligation. Indeed, Mr. Truono testified that the ESOP repurchase obligation had never exceeded $100,000 in any year.

In sum, Mr. Fodor's failure to address the foregoing issues leaves us unpersuaded of his claim that BCC's annual ESOP repurchase obligation requires a $750,000 downward adjustment to either the income- or asset-based valuation methods he chose.[33] Instead, we are persuaded that, under the facts presented here, Mr. Hitchner was correct in his position that any ESOP repurchase obligation did not warrant the adjustments of the sort Mr. Fodor advocated.

Because Mr. Fodor's $750,000 adjustment led to a dollar-for-dollar decrease in both his income- and asset-based values, the adjustment led to a dollar-for-dollar decrease in his final blended estimate of BCC's value. Correcting Mr. Fodor's treatment of the ESOP repurchase obligation to remove the

---

[33] Because of these shortcomings in Mr. Fodor's analysis of the need for an adjustment to account for an ESOP repurchase obligation, we do not reach the separate question of whether Mr. Fodor's report may rely upon the 1997 BVS appraisal's $750,000 figure without qualifying that appraisal as expert testimony.

$750,000 downward adjustment yields a value for BCC of $6.75
million, as compared to Mr. Hitchner's $7 million estimate.

    3.   <u>Mr. Hitchner's Estimate of Excess Cash</u>

Mr. Hitchner calculated that BCC had nonoperating assets of
approximately $2.3 million.  This figure included $433,572 for
notes receivable and an idle asphalt plant, plus approximately
$1.9 million of "excess cash"; i.e., that portion of BCC's cash
on hand that Mr. Hitchner considered to be in excess of BCC's
working capital needs.  To determine excess cash, Mr. Hitchner
compared BCC's ratio of cash to assets as of the valuation date
with the industry average ratio of cash to assets for SIC code
1611 (Contractors--Highway & Street Construction).  Using the
industry average ratio for 1997 and BCC's assets, he determined
that BCC required $1,125,029 of cash and cash equivalents.  Since
the cash and cash equivalents BCC had on hand as of the valuation
date ($2,994,970) exceeded this industry average by $1,869,941,
Mr. Hitchner concluded that BCC had excess cash, approximately
equal to the latter figure, which he treated as a nonoperating
asset.

We are persuaded that Mr. Hitchner's reliance on industry
averages to measure BCC's cash requirements produces an erroneous
estimate.  The uncontested testimony in this case establishes
that BCC required approximately $1.5 million in cash and cash

equivalents for its business needs, in particular to meet bonding requirements without drawing on personal guaranties of its owners. The record does not disclose whether the paving contractors covered by SIC code 1611 provided personal guaranties to meet bonding requirements, but we are satisfied from the record herein that personal guaranties would affect cash needs. Given the unreliability of the industry average as applied to BCC, we are persuaded that the $1.5 million actual cash requirement of BCC, demonstrated in the record, is a better benchmark for determining excess cash than Mr. Hitchner's approximately $1,125,000 derived from an industry average. Thus, we conclude that the proper measure of BCC's excess cash is the amount by which its cash and cash equivalents on hand on the valuation date ($2,994,970 exclusive of life insurance proceeds) exceeded $1.5 million. Accordingly, we find that BCC had excess cash of approximately $1.5 million, not the approximately $1.9 million calculated by Mr. Hitchner. Consequently, Mr. Hitchner's computation of nonoperating assets, and his income-based value, should be reduced by $400,000.

4. Conclusion

Since Mr. Fodor's $750,000 downward adjustment to account for the ESOP repurchase obligation was made to both his income- and asset-based values, elimination of that adjustment would

produce a $750,000 increase in his final blended value as well, from $6 million to $6,750,000. Mr. Hitchner's error in computing excess cash affected only his income-based value, inflating it by $400,000. As noted earlier, Mr. Hitchner did not disclose the precise weight he attributed to his income-based value when blending it with his asset-based values to reach a final blended value of $7 million (exclusive of insurance proceeds), except to point out that he gave greater weight to his "adjusted book value" asset value and lesser but equal weight to his "modified adjusted book value" asset value and income value.

In these circumstances, while the precise impact on his $7 million blended value of a $400,000 decrease in his income-based value cannot be ascertained, we are satisfied that the impact would move Mr. Hitchner's $7 million blended value significantly closer to our corrected $6,750,000 value for Mr. Fodor. We accordingly find that $6,750,000 is a reasonable point in the range of values derivable from the two experts' analyses and conclude that this is the correct figure for BCC's fair market value, exclusive of the impact of the life insurance proceeds received with respect to decedent.

D.  Effect of Redemption Obligation on Insurance
    Proceeds

We turn next to the question of how to account for the $3,146,134 million in life insurance proceeds BCC was due to

receive on decedent's death and BCC's $4 million obligation to redeem decedent's shares, as set forth in the Modified 1981 Agreement. Mr. Fodor excluded both the insurance proceeds and the redemption obligation when determining BCC's value on the theory that the insurance proceeds were offset by the redemption obligation. In contrast, Mr. Hitchner included the insurance proceeds in valuing BCC, adding their value to his $7 million "concluded" value for BCC, while disregarding the redemption obligation.

Respondent argues that the insurance proceeds must be included in BCC's value as a nonoperating asset, relying on section 20.2031-2(f), Estate Tax Regs., and Estate of Huntsman v. Commissioner, 66 T.C. 861 (1976). In contrast, the estate argues that, while insurance proceeds might be a nonoperating asset, under Estate of Cartwright v. Commissioner, 183 F.3d 1034 (9th Cir. 1999), affg. in part and remanding in part T.C. Memo. 1996-286, they must be offset by BCC's obligation to redeem decedent's shares, and therefore do not affect BCC's value.

Estate of Huntsman makes clear that insurance proceeds are treated like any other nonoperating asset when determining a closely held corporation's value. Estate of Huntsman v. Commissioner, supra at 874; see also sec. 20.2031-2(f), Estate Tax Regs. ("consideration shall also be given to nonoperating

assets, including proceeds of life insurance policies payable to or for the benefit of the company, to the extent such nonoperating assets have not been taken into account in the determination of net worth, prospective earning power and dividend-earning capacity").  Whether BCC's $4 million obligation to redeem decedent's shares offsets the life insurance proceeds, as the estate argues, is another question.  In Estate of Huntsman, we reasoned that, because life insurance proceeds should be treated like any other nonoperating asset, to the extent such assets were considered in valuing a company, they were subject to offset by corporate liabilities.  However, we were not presented in that case with the question of whether a corporation's obligation to redeem the very shares that are to be valued should be treated as a liability, offsetting corporate assets.[34]  The estate here urges that we treat BCC's enforceable $4 million obligation to redeem the shares whose value is at issue as a liability offsetting BCC's assets (i.e., the $3,146,134 life insurance proceeds plus almost $1 million in other assets) in arriving at the value of the same shares.

---

[34] The only redemption involved in Estate of Huntsman v. Commissioner, 66 T.C. 861 (1976), was of a sufficient number of the decedent shareholder's shares to pay estate taxes.  The shares whose value was at issue in Estate of Huntsman were not the subject of a redemption obligation of the corporation.

We decline to do so for two reasons.  First, we have concluded that the agreement under which BCC was obligated to redeem decedent's shares for $4 million must be disregarded under both section 20.2031-2(h), Estate Tax Regs., and section 2703. In such circumstances, the terms of the disregarded agreement are generally not taken into account in determining the fair market value of the shares subject to the agreement.  Estate of True v. Commissioner, T.C. Memo. 2001-167; Estate of Lauder v. Commissioner, T.C. Memo. 1994-527; see also Estate of Godley v. Commissioner, T.C. Memo. 2000-242, affd. 286 F.3d 210 (4th Cir. 2002).  As we noted in Estate of Lauder, under these circumstances, the willing buyer/seller analysis would be distorted if we disregarded the buy-sell agreement for purposes of fixing the value of the subject stock, yet allowed provisions in the agreement to be taken into account when determining the stock's fair market value.  Thus, it would be improper here to consider the redemption obligation in the disregarded buy-sell agreement when determining the fair market value of the stock covered by that agreement.

Second, even if the impact of the redemption obligation on BCC's value were not disregarded under the principles of Estate of Lauder and like cases, the redemption obligation should not be treated as a value-depressing corporate liability when the very

shares that are the subject of the redemption obligation are being valued.  To do so would be to value BCC in its postredemption configuration; namely, after decedent's shares had been redeemed and BCC's assets had been contracted by the $4 million redemption payment.  Valuing decedent's 43,080 shares by means of the hypothetical willing buyer/seller construct necessarily requires that the corporation's actual obligation to redeem the shares be ignored; such a stance is inherent in the fiction that the shares are being sold to a hypothetical third-party buyer on the valuation date rather than being redeemed by the corporation.  To the hypothetical willing buyer, decedent's 43,080 BCC shares constituted an 83.2-percent interest in all of the assets and income-generating potential of BCC on the valuation date, including any assets that might be used to satisfy the actual redemption obligation.  To treat the corporation's obligation to redeem the very shares that are being valued as a liability that reduces the value of the corporate entity thus distorts the nature of the ownership interest represented by those shares.

By contrast, a hypothetical willing buyer of BCC shares other than decedent's would treat the redemption obligation, on the valuation date, as a corporate liability of BCC, but only in connection with a simultaneous accounting of the impact of the

redemption of decedent's shares on the ownership interest inherent in the other shares not being redeemed.

A simplified example will illustrate the fallacy behind the estate's contention that BCC's obligation to redeem decedent's shares should be treated as a liability offsetting a corresponding amount of corporate assets. Assume corporation X has 100 shares outstanding and two shareholders, A and B, each holding 50 shares. X's sole asset is $1 million in cash. X has entered into an agreement obligating it to purchase B's shares at his death for $500,000. If, at B's death, X's $500,000 redemption obligation is treated as a liability of X for purposes of valuing B's shares, then X's value becomes $500,000 ($1 million cash less a $500,000 redemption obligation). It would follow that the value of B's shares (and A's shares) is $250,000 (i.e., one half of the corporation's $500,000 value[35]) upon B's death. Yet if B's shares are then redeemed for $500,000, A's shares are then worth $500,000--that is, A's 50 shares constitute 100-percent ownership of a corporation with $500,000 in cash.

It cannot be correct either that B's one-half interest in $1 million in cash is worth only $250,000 or that A's one-half

---

[35] Among other simplifications, this example ignores the existence of discounts or premiums attributable to the magnitude of the ownership interest represented by corporate shares. We note that the parties do not contend that any such discounts or premiums are appropriate in the instant case.

interest in the remainder shifts from a value of $250,000 preredemption to a value of $500,000 postredemption.

The error with respect to B's shares in the example lies in the treatment of X's redemption obligation as a claim on corporate assets when valuing the very shares that would be redeemed with those assets. With respect to A's shares, a willing buyer would pay $500,000 upon B's death (not $250,000) because he would take account of both the liability arising from X's redemption obligation and the shift in the proportionate ownership interest of A's shares occasioned by the redemption-- but never the former without the latter.[36]

The estate's reliance on Estate of Cartwright v. Commissioner, 183 F.3d 1034 (9th Cir. 1999), is misplaced, as that case is distinguishable. Estate of Cartwright involved a law firm (organized as a C corporation) that entered into a buy-sell agreement with its majority shareholder. The parties agreed that the firm would purchase from the shareholder's estate his shares and his interest in the fees for the firm's work in

---

[36] In this simplified example, a willing buyer of A's shares would pay $500,000 for A's shares whether the redemption obligation existed or not. But that is only because, in this example, X is obligated to redeem B's shares at their fair market value of $500,000. If X were obligated to redeem B's shares at a price greater or less than $500,000, then a willing buyer of A's shares would pay less than $500,000, or more than $500,000, respectively, for A's shares.

progress at his death.  The consideration for this purchase was designated as the proceeds from two $2.5 million life insurance policies on the shareholder's life that the firm was required to obtain under the agreement.

Upon the shareholder's death, the firm paid the $5,062,029[37] insurance proceeds to the shareholder's estate.  The taxpayer took the position that the entire $5,062,029 was paid for the shareholder's stock, whereas the Commissioner determined that approximately $4 million was paid for the shareholder's interest in work in progress (and, therefore, was income in respect of a decedent).  Concluding that the insurance proceeds were consideration for both the stock and the shareholder's interest in work in progress, this Court undertook to allocate the consideration between the two by determining the stock's fair market value at the shareholder's death, and treating the insurance proceeds in excess of that fair market value as consideration paid for the shareholder's interest in work in progress.  In determining the fair market value of the stock, we rejected the taxpayer's argument that the $5 million in insurance proceeds should be treated as a nonoperating asset of the firm,

---

[37] The policy proceeds that served as consideration for the purchase were construed by the parties as comprising the two $2.5 million death benefits plus $62,029 in premium adjustments and interest.

augmenting the value of its stock, on the grounds that the insurance proceeds were offset by the firm's obligation to pay them over to the estate. In so concluding, we relied on Estate of Huntsman v. Commissioner, 66 T.C. 861 (1976), as follows: "We said in Estate of Huntsman that a buyer would not pay more for stock based on the corporation's ownership of life insurance if the proceeds would be largely offset by the corporation's liabilities. That is the case here." Estate of Cartwright v. Commissioner, T.C. Memo. 1996-286 (citation omitted). The Court of Appeals for the Ninth Circuit affirmed our position that the life insurance proceeds would not be considered by a hypothetical willing buyer in these circumstances. Estate of Cartwright v. Commissioner, 183 F.3d at 1038.

Estate of Cartwright is distinguishable. The lion's share of the corporate liabilities in that case which were found to offset the insurance proceeds were not obligations of the corporation to redeem its own stock. Rather, we determined that approximately $4 million of the $5 million liability of the corporation was to compensate the decedent shareholder for services; i.e., for his interest in work in progress. Thus, a substantial portion of the liability was no different from any third-party liability of the corporation that would be netted

against assets, including insurance proceeds, to ascertain net assets.

Concededly, a portion of the liability in Estate of Cartwright constituted an obligation to redeem stock being valued. Nonetheless, in contrast to the instant case, the buy-sell agreement in Estate of Cartwright had not been disregarded pursuant to section 20.2031-2(h), Estate Tax Regs., or section 2703; indeed, our principal task in Estate of Cartwright was to construe the terms of the buy-sell agreement, which was fully respected. Given the disregarded status of the buy-sell agreement at issue here, Estate of Cartwright has no application.[38]

Accordingly, we conclude that the $3,146,134 in insurance proceeds due BCC upon decedent's death should be treated as a nonoperating asset of BCC and is not offset by BCC's $4 million obligation to redeem decedent's shares.

E.    Accounting for Insurance Proceeds

Having established that the life insurance proceeds are a nonoperating asset that is not offset by BCC's $4 million obligation to redeem decedent's shares, we turn next to the

---

[38] Moreover, the life insurance proceeds in Estate of Cartwright v. Commissioner, T.C. Memo. 1996-286, affd. in part and remanded in part 183 F.3d 1034 (9th Cir. 1999), were contractually earmarked and required to be paid over to the decedent's estate. No such requirement existed in the instant case; BCC was free to use the insurance proceeds in any manner, though it in fact paid them over in partial satisfaction of its obligation to redeem decedent's shares.

question of how those proceeds should be taken into account when valuing BCC.  Section 20.2031-2(f), Estate Tax Regs., provides that "consideration shall also be given to nonoperating assets, including proceeds of life insurance policies".  As we stated in Estate of Huntsman v. Commissioner, supra at 874, "it is * * * obvious that the price paid by a willing buyer would not necessarily be increased by the amount of the life insurance proceeds."  Rather, one applies "customary principles of valuation" to determine the impact of life insurance proceeds on corporate value.  Id. at 876.  Here both experts contend that BCC's value should be determined using a blend of income- and asset-based approaches, and the impact of the insurance proceeds on BCC's value depends on how those proceeds are treated under those approaches.

Where a corporation has significant nonoperating assets, one well-established method of accounting for those assets in an income-based approach--and the method proposed by Mr. Hitchner--is to add the value of those assets to capitalized earnings.  See, e.g., Estate of Heck v. Commissioner, T.C. Memo. 2002-34; Estate of Renier v. Commissioner, T.C. Memo. 2000-298; Estate of Ford v. Commissioner, T.C. Memo. 1993-580, affd. 53 F.3d 924 (8th Cir. 1995); Estate of Gillet v. Commissioner, T.C. Memo. 1985-394; Estate of Clarke v. Commissioner, T.C. Memo.

1976-328. As we stated in Estate of Gillet v. Commissioner,

supra:

> The segregated approach to valuation [i.e., valuing operating assets by capitalizing the income they generate and then adding in the value of nonoperating assets] has been accepted by the courts where the evidence establishes that there was an accumulation by the corporation of assets in excess of business needs that would require separate evaluation. * * * [Citations omitted.]

This same principle holds true where the nonoperating assets in question are life insurance proceeds to which the corporation becomes entitled upon the death of the shareholder whose shares are being valued. See Estate of Clarke v. Commissioner, supra; see also Estate of Heck v. Commissioner, supra.

In the instant case, the record establishes that BCC had significant nonoperating assets as of the valuation date, including an idle asphalt plant, notes receivable, and substantial amounts of cash in excess of its operational needs (without regard to the life insurance proceeds). Mr. Truono, BCC's chief financial officer, testified that BCC required $1.5 million in cash and cash equivalents to meet operating needs. Mr. Fodor's report indicated that BCC had over $2.5 million in cash and cash equivalents on the valuation date. Mr. Fodor's report further revealed that BCC had far more working capital, as a percentage of revenues, than other companies in similar SIC groups. Mr. Hitchner persuasively demonstrated that BCC had significantly more cash and cash equivalents, as a percentage of

assets, than companies in the SIC group most closely approximating BCC.[39] In these circumstances, we are persuaded that adding the value of nonoperating assets, including life insurance proceeds, to capitalized earnings, as Mr. Hitchner proposed, is an appropriate measure of BCC's income-based value.[40]

Because BCC had positive net assets, treating the life insurance proceeds as a nonoperating asset also produces an increase in the asset-based value of BCC, equal to the amount of the proceeds, under all three asset-based approaches employed by the experts herein. Thus, because the life insurance proceeds are added in both the income- and asset-based approaches, they result in an increase in the final blended value of BCC equal to the amount of the life insurance proceeds, regardless of the respective weights given to the income- or asset-based approach. Accordingly, we are persuaded that Mr. Hitchner was correct in

[39] Although we concluded supra at Pt.II.C.3. that Mr. Hitchner overestimated the extent of BCC's excess cash, after our adjustment BCC's excess cash on the valuation date was still approximately $1.5 million.

[40] We note that even if we were to adopt Mr. Fodor's proposal regarding the necessary additions to capitalized earnings to derive an income-based value, the life insurance proceeds would still be added to capitalized earnings, and the income-based value would increase dollar for dollar. Had he not offset the life insurance proceeds with BCC's obligation to redeem decedent's shares, those proceeds would have been an addition to net working capital, which Mr. Fodor added to BCC's capitalized earnings in calculating an income-based value.

his view that the life insurance proceeds should be accounted for as a dollar-for-dollar increase in the value otherwise determined for BCC.

The estate contends that this treatment of life insurance proceeds is inconsistent with Estate of Huntsman v. Commissioner, 66 T.C. 861 (1976), because it leads to an increase in BCC's value equal to those proceeds.  We disagree.  In Estate of Huntsman v. Commissioner, supra at 874, we observed that "it is * * * obvious that the price paid by a willing buyer would not necessarily be increased by the amount of the life insurance proceeds."  (Emphasis added.)  We rejected the Commissioner's position in that case that life insurance proceeds, received by the corporation upon the death of the shareholder whose shares were being valued, produced a dollar-for-dollar increase in the corporation's value because his position "would treat the life insurance proceeds differently than other nonoperating assets." Id. at 875.  The income-based valuation approach employed in Estate of Huntsman multiplied earnings by a price-earnings ratio without factoring nonoperating assets into the income-based value.  The life insurance proceeds therefore did not affect the income-based value; they were accounted for only as part of the asset-based value.  Since the asset-based value produced only a proportionate impact on the final blended value, the life

insurance proceeds (like all other nonoperating assets) had less than a dollar-for-dollar impact on the final blended value. See id. at 878.

In the instant case, Mr. Hitchner's income-based approach, in recognition of the fact that BCC had substantial nonoperating assets, employed the well-established technique in such circumstances of adding nonoperating assets (including life insurance proceeds) to capitalized earnings.[41] In contrast to the valuation methods employed in Estate of Huntsman, this approach treats all nonoperating assets alike and results in a dollar-for-dollar increase in final value equal to the life insurance proceeds, when used alone, see, e.g., Estate of Heck v. Commissioner, T.C. Memo. 2002-34, and when blended with an asset-based approach, see, e.g., Estate of Clarke v. Commissioner, T.C. Memo. 1976-328. Thus, whether life insurance proceeds produce a dollar-for-dollar increase in final value depends upon the valuation methods employed. In observing that life insurance proceeds "would not necessarily" increase value dollar-for-dollar, Estate of Huntsman does not preclude this result.

---

[41] As noted previously, but for his conclusion that the life insurance proceeds were offset by BCC's obligation to redeem decedent's shares, Mr. Fodor's methodology would also have dictated adding the life insurance proceeds to capitalized earnings, because the proceeds would have been a component of his computation of net working capital.

Accordingly, for the foregoing reasons we conclude that the $3,146,134 in life insurance proceeds should be added to the $6,750,000 value previously determined, with the result that BCC had a fair market value of $9,896,134 on the valuation date.

III.  Conclusion

Both experts derived the value of decedent's 43,080 shares by multiplying their final blended values for BCC by decedent's 83.2-percent ownership interest.  Neither applied any discounts or premiums.  We are persuaded that this approach is appropriate here.  Multiplying BCC's total value of $9,896,134 by 83.2 percent yields a value for decedent's 43,080 shares of $8,233,583 on the valuation date.

Because we are persuaded by a preponderance of the evidence that the fair market value of decedent's BCC stock exceeded the amount respondent determined, we sustain respondent's determination.

To reflect the foregoing and the concessions of the parties,

Decision will be entered

under Rule 155.